1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
SEATTLE DIVISION

| | |
|---|---|
| FLI-LO FALCON, LLC, on behalf of itself and all others similarly situated,<br><br>                              Plaintiff,<br><br>         v.<br><br>AMAZON.COM, INC. and AMAZON LOGISTICS, INC.,<br><br>                              Defendants. | No.<br><br>CLASS ACTION COMPLAINT<br>JURY DEMAND |

CLASS ACTION COMPLAINT - 1

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

Plaintiff, Fli-Lo Falcon, LLC ("Plaintiff" or "Fli-Lo"), brings this action individually and on behalf of all business entities in the United States that executed a 2.0 Delivery Service Partners Agreement with Amazon Logistics, Inc. ("ALI"), acting on behalf of Amazon.com, Inc. ("Amazon") (collectively referred to as "Amazon" or "Defendants"), from 2019 to present, for damages.

Plaintiff's allegations pertaining to it are made on personal knowledge.  All other allegations are based on information and belief pursuant to the investigation conducted by Plaintiff's counsel, which includes, but is not limited to, a review of the contracts, policies, and marketing materials discussed below, as well as publicly available information, including Defendants' filings with the Securities and Exchange Commission.

## NATURE OF THE ACTION

1.      This class action case is brought on behalf of small package delivery companies, known as "Delivery Service Partners" or "DSPs," with whom Amazon, through its wholly-owned subsidiary, ALI, contracts to deliver Amazon's products to consumers (the "DSP Program").  Amazon is among the world's largest companies and dominates e-commerce in the United States.  With over 300 million active users, Amazon, as of 2021, controlled more than 40% of the U.S. e-commerce market share and measures quarterly profits in billions of dollars.  The typical DSP has a fleet of approximately 20 – 40 Amazon-branded vans.  As of December 2021, approximately 2,500 DSPs were part of Amazon's DSP Program.  The purpose of the DSP Program is to shield Amazon from its responsibilities to delivery drivers and the public.  Amazon, by and through ALI, exercises near complete control over the DSPs but fails to provide the required safeguards under Washington's Franchise Investment Protection Act.

2.      Amazon fraudulently induced Plaintiff and other DSP owners to enter into DSP contracts ("DSP Agreements") with ALI with misrepresentations that they will own and operate independent businesses earning profits between $75,000 and $300,000 annually.  In reality, DSPs do not earn profits in that range.  ALI uses its technology and

CLASS ACTION COMPLAINT - 2

1   control to limit DSPs' capacity to earn the represented profits.

2       3.    Despite promising DSPs a significant level of autonomy, the DSPs are not

3   independent businesses and their activities are dictated and run by Amazon through ALI.

4   Amazon requires its DSPs to make a substantial investment and to use certain vendors

5   under Defendants' terms. DSPs do not control their own operations and are restricted

6   from making material adjustments to increase their profits. ALI uses a subjective and

7   opaque formula with impossible benchmarks to determine how much money DSPs will

8   receive. DSPs are liable for acts of the drivers, who are pressed to meet the delivery

9   schedules mandated by ALI. Finally, DSPs are assessed costs by ALI if they try to exit

10   the DSP Program.

11       4.    By entering into the DSP Agreements, the parties consent to the

12   application of Washington law. Defendants violated Washington's Franchise Investment

13   Protection Act by, among other things, portraying the DSP Program as an opportunity

14   for DSP owners to operate their own business without reasonable interference by

15   Defendants when, in reality, the DSP owners are unable to control critical aspects of

16   their business. Violations of Washington's Franchise Investment Protection Act

17   constitute unfair or deceptive acts, which in turn are a per se violation of Washington's

18   Consumer Protection Act.

19       5.    This complaint seeks damages for Defendants' fraud, fraudulent

20   inducement, breach of the implied covenant of good faith and fair dealing, and violation

21   of the state of Washington's Consumer Protection Act based on violations of

22   Washington's Franchise Investment Protection Act.

23   **JURISDICTION AND VENUE**

24       6.    This Court has subject matter jurisdiction over the state law claims under

25   28 U.S.C. § 1332(d), as amended by the Class Action Fairness Act of 2005, Pub. L. No.

26   109-2, 119 Stat. 4, because the amount in controversy for the Class exceeds $5,000,000

27

CLASS ACTION COMPLAINT - 3

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

1  and because there are members of the Class who are citizens of a different state than

2  Defendants.

3      7.     The Court has personal jurisdiction over Defendants because their principal

4  places of business are in Seattle, Washington.

5      8.     Venue is proper in this judicial district because a substantial part of the

6  events, acts, omissions, and injuries giving rise to the claims – *e.g.*, the formation of the

7  DSP Agreements and Defendants' issuance of bad faith edicts dictating the DSPs'

8  business operations – occurred in this judicial district, and because Defendants have

9  their principal places of business in this judicial district and are subject to personal

10 jurisdiction in this judicial district at the time this action has commenced.

11                                    **THE PARTIES**

12     9.     Max Whitfield ("Whitfield") is a resident of California.  Whitfield owns and

13 operates Fli-Lo, a single-member limited liability company, which was originally

14 incorporated in North Carolina and is currently operating in Wyoming as its home state

15 with its principal offices in Casper, Wyoming.  Fli-Lo is a transportation and logistics

16 company, which entered into a contract to deliver packages for ALI in the Sacramento,

17 California area from October 2019 to May 15, 2021.  Fli-Lo first delivered packages for

18 Amazon in January 2020.

19     10.    Defendant Amazon Logistics, Inc. is a Delaware corporation with its

20 principal place of business at 410 Terry Avenue North, Seattle, Washington 98109.  ALI

21 is a transportation and logistics company.  ALI is a wholly-owned subsidiary of Amazon.

22 ALI provides transportation and logistics services primarily to Defendant Amazon.

23     11.    Defendant Amazon.com, Inc. is a Delaware corporation with its principal

24 place of business at 410 Terry Avenue North, Seattle, Washington 98109.  Amazon's

25 deliveries are effectuated through ALI, an Amazon subsidiary founded in 2016.  Upon

26 information and belief, Amazon has complete control over ALI's business.  In its few

27 short years, ALI has gained control over 20% of the total package shipping market in the

CLASS ACTION COMPLAINT - 4

1    United States.[1]  ALI's tremendous growth has vaulted it ahead of Federal Express, one

2    of the industry leaders with decades more experience than ALI.  Upon information and

3    belief, Amazon is ALI's primary or only customer.

4         12.    Upon information and belief, Defendants are and were at all relevant times

5    the agents, affiliates, alter egos, partners, assignees, joint venturers, successors-in-

6    interest, or principals of each other, or were otherwise responsible for or participated in

7    the performance of the wrongful acts alleged herein, and thereby are jointly and severely

8    responsible for such acts and incurred liability.

9                               **FACTUAL ALLEGATIONS**

10        13.    Amazon is the world's largest online retailer, reporting almost $370 billion

11   in estimated sales for 2021.[2]  As of October 2021, Amazon accounted for 41% of the

12   U.S. e-commerce market, making it by far the leading online retailer in the country.[3]

13        14.    Amazon describes itself as a company that is customer obsessed.   To

14   ensure customer satisfaction, Amazon obtained greater control over its deliveries by

15   establishing its own delivery and logistics network, ALI.  Notably, Amazon's creation of

16   the network, which, as discussed below, relies on individual businesses to make

17   deliveries, was also animated by its desire to avoid the unionization of its delivery

18   personnel.[4]

19

20

21   [1] John Corrigan, *Report: Amazon Surpasses FedEx in U.S. Shipping Share*, ADVERTISING SPECIALTY
22   INSTITUTE (Oct. 21, 2021), https://www.asicentral.com/news/newsletters/promogram/october-2021/report-
     amazon-surpasses-fedex-in-us-shipping-share/.

23   [2] Chris Walton, *5 Things The Top 10 Online U.S. Retailer List Says About the Future*, FORBES (May 18,
     2021), https://www.forbes.com/sites/christopherwalton/2021/05/18/5-things-the-top-10-online-us-retailer-
24   list-says-about-the-future/?sh=6ee9a2eb6ef4.

25   [3] Stephanie Chevalier, *Market Share of Leading Retail E-Commerce Companies in the United States as
     of October 2021*, STATISTA (Oct. 29, 2021), https://www.statista.com/statistics/274255/market-share-of-
     the-leading-retailers-in-us-e-commerce/.

26   [4] Matt McFarland, *Amazon Thrived During the Pandemic – These Drivers Say They Paid the Price*, WTOP
27   NEWS (June 3, 2021), https://wtop.com/business-finance/2021/06/amazon-thrived-during-the-pandemic-
     these-drivers-say-they-paid-the-price/.

CLASS ACTION COMPLAINT - 5

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

15.    Amazon's delivery and logistics network is called the DSP Program.  Under the DSP Program, Amazon contracts with ALI, its subsidiary, for delivery and transportation of the products it sells to consumers online.  ALI, in turn, contracts with transportation and logistics companies around the country, which are called "DSPs," to deliver Amazon packages.  The DSPs, in turn, hire drivers to deliver packages for Amazon within the DSPs' service areas.

16.    ALI advertises the DSP Program as an opportunity for small business owners to run their own businesses, and to earn substantial income.  Indeed, the uniform written marketing materials that ALI provides to its prospective DSPs, and which are available on Amazon's website, tout that the annual profit potential for DSPs is $75,000 to $300,000.  A copy of those materials is annexed hereto as Exhibit A.

17.    However, as discussed below: (i) DSPs are required to adhere to ALI's strict method of operations and use all of ALI's trademarks; (ii) ALI dictates control over every material aspect of a DSP's business operations; and (iii) the potential profit range is a pipe dream that is rarely achieved, and, in fact, is undermined by ALI's implementation of the DSP Program.

18.    Under the DSP Program, ALI subjectively assigns "scores" to drivers and DSPs based on performance and productivity.  ALI relies on these scores when determining, among other things, whether a DSP is eligible for bonuses.  Given the high operating costs, a DSP must receive bonuses to have any realistic opportunity to become profitable.

19.    The original DSP Program was launched in June 2018 and was called the DSP 1.0 Program.  The DSP 2.0 Program was rolled out in 2019.

20.    Upon information and belief, Amazon created the DSP 2.0 Program as a way to refine and institute stricter performance criteria.  Among other innovations, Amazon (i) limited each DSP owner to owning only one DSP business, in order to prevent any one owner from gaining bargaining leverage, and (ii) set exceedingly aggressive

CLASS ACTION COMPLAINT - 6

time limits that could rarely be safely met for DSPs to complete their routes, and that made attaining a bonus close to impossible.

21.   Whitfield established Fli-Lo to exclusively deliver packages for the DSP 2.0 Program and did so from January 2020 to May 15, 2021.

22.   Fli-Lo employed a total of 188 drivers between January 2020 to May 2021. On average, Fli-Lo tried to have at least 80 drivers on its payroll at any given time. However, Fli-Lo incurred constant training expenses due to high driver turnover because of the difficult routes and low pay mandated by Amazon.  Amazon did not reimburse Fli-Lo for training expenses.  Additionally, every driver Fli-Lo hired had to go through a training program set up by Amazon.  Therefore, Fli-Lo was unable to hire more drivers until a spot opened in an Amazon training class.

23.   On average during non-peak operations, Fli-Lo delivered 280-320 packages daily, per van.  On average during peak operations, Fli-Lo delivered 350-400 packages daily, per van.

24.   Whitfield executed a DSP Agreement on behalf of Fli-Lo with ALI, expecting to have a fair opportunity to enjoy the benefit of their bargain and to work collaboratively and in good faith with ALI.

25.   The DSP Agreement states each DSP owner "can accept or reject any opportunity" offered by ALI and ALI "may give [the] company route plans, forecasts, or other projections."

26.   Marketing materials provided by Amazon state the DSP Program "provides an opportunity for strong leaders who are passionate about developing a hardworking team to start their own business."  *See* Exhibit A attached hereto.

27.   In reality, however, ALI controlled nearly every aspect of Plaintiff's business, created unsafe working conditions for its drivers, and arbitrarily imposed penalties causing Fli-Lo significant damages.

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

28.     Additionally, Amazon constantly and unilaterally changes the DSP Program requirements, which ensures that the individual DSPs are not able to reach the advertised annual profit potential.

29.     Fli-Lo entered into the DSP Agreement based on marketing materials provided by ALI, which stated that the annual profit potential for DSPs would be $75,000 - $300,000.  *See* Exhibit A attached hereto.

30.     As of February 20, 2022, the average annual pay for an Amazon DSP in the United States was $63,874 a year.[5]

31.     Additionally, the top Amazon DSP annual salary was $185,500 and the lowest annual salary was $20,500.  The majority of Amazon DSPs range between $31,500 (25th percentile) and $64,500 (75th percentile), meaning that the vast majority of DSPs earn significantly less than the low-end of the profit range ALI touted in its marketing materials.

32.     In order to get their delivery business up and running, Defendants also required DSPs to spend a minimum of $10,000 in start-up costs, which consisted largely of purchases from Amazon's vendors.  Accordingly, Fli-Lo and members of the Class incurred significant costs to set up their businesses, including overhead, hiring, and training costs, among other expenses.

33.     Section 10 of the standard form DSP Agreement, which Fli-Lo entered into, provides that DSPs are entitled to exercise a significant level of autonomy over the operations:

> Your company is an independent contractor of Amazon.  Your company has exclusive responsibility for its Personnel, including exclusive control over compensation, hours, and working conditions.  Your company's Personnel are not eligible for any employee benefits available to employees of Amazon or any of its Affiliates.  Neither your company nor any

---

[5]  *Amazon Delivery Partner Salary*, ZIPRECRUITER,  https://www.ziprecruiter.com/Salaries/Amazon-Delivery-Partner-Salary (last visited March 7, 2022).

of its Personnel has any authority to bind Amazon to any agreement or obligation.

34.    In fact, however, while Plaintiff was a DSP, Defendants dictated, directly managed, and controlled nearly every aspect of the DSP's operations, including, but not limited to:

    a.  Requiring Plaintiff to operate exclusively under the ALI trademark;

    b.  Requiring Plaintiff to follow and operate pursuant to ALI's method of operations;

    c.  Requiring Plaintiff to make purchases through authorized vendors only;

    d.  Controlling all hiring of Plaintiff's drivers;

    e.  Retaining the ability to terminate and discipline Plaintiff's drivers;

    f.  Providing inadequate training to Plaintiff's drivers;

    g.  Requiring Plaintiff's drivers to wear ALI-branded clothing;

    h.  Dictating the personal grooming requirements of drivers, their manner, and type of clothing drivers wear;

    i.  Determining the make, model, and style of delivery van to be used while Plaintiff's drivers deliver packages;

    j.  Requiring Plaintiff to sign a contract with Element Fleet for delivery vehicles;

    k.  Requiring Plaintiff to contract with Aon for insurance;

    l.  Requiring Plaintiff to contract with Paycom or ADP for payroll;

    m. Requiring that delivery vans contain ALI insignia and logos and prohibiting Plaintiff from displaying its own name or branding on the vans;

    n.  Requiring Plaintiff's drivers to arrive at and load and unload packages from ALI's warehouse centers for delivery;

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

o. Monitoring Plaintiff's drivers' performance of pre-trip and post-trip delivery van inspections and Plaintiff's performance and compliance with ALI's requirements;

p. Requiring that Plaintiff's drivers deliver packages to Amazon customers according to a precise schedule created by ALI that dictates the order of delivery and provides the exact route that Plaintiff's drivers must follow and does not allow Plaintiff to modify any routes;

q. Dictating how many packages Plaintiff's drivers must deliver each day on each route and not allowing Plaintiff to modify package counts;

r. Tracking delivery performance, including, but not limited to, the number of packages Plaintiff's drivers deliver each day, the location of Plaintiff's drivers at any given time, whether drivers touched their cell phones while driving, whether drivers were wearing seatbelts, whether drivers moved over the speed limit, whether drivers accelerated or stopped too quickly, and the efficiency of the deliveries as reported through ALI's handheld devices, the Flex App, and/or the Mentor App;

s. Supervising the work of Plaintiff's drivers on a daily basis;

t. Evaluating the performance of Plaintiff's drivers on a periodic basis in accordance with ALI's specific policies and procedures;

u. Setting minimum wages, insurance coverage, and benefits that Plaintiff must provide to its own drivers;

v. Requiring Plaintiff to submit to periodic audits so that Amazon can verify that Plaintiff has complied with Amazon's requirements with respect to wages, insurance, and benefits for Plaintiff's drivers;

w. Ordering Plaintiff's drivers to reattempt delivery when Plaintiff's drivers do not complete a delivery; and

x. Maintaining control over and access to Plaintiff's payroll accounts.

CLASS ACTION COMPLAINT - 10

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

35.     Plaintiff offered, sold, and/or distributed services to Defendants' customers, while using ALI's trademarks and marketing plan.

**A.     Routes, Packages, and Safety**

36.     ALI's DSP marketing materials advertise that each DSP owner can have up to 40 vans in its fleet.  According to the materials, if a DSP "deliver[ed] a great customer experience" it would have the opportunity to grow its business and deliver more packages and earn more profits.  *See* Exhibit A attached hereto.

37.     Throughout its time operating as a DSP for Amazon, Fli-Lo was given, on average, 25 routes per day by ALI for its drivers to cover in the Sacramento, California area.  The number of routes a DSP has is coterminous with the number of vans/trucks it was required to maintain in its fleet.  In other words, ALI requires one van/truck per route.

38.     Upon information and belief, even to reach the lowest end of the profit range promised by ALI, a DSP owner has to operate at least 40 routes per day.  However, the restrictions ALI places on the DSPs' ability to hire and train drivers renders it virtually impossible for a DSP to timely hire additional drivers in order to ramp up its operations and vie for additional routes in order to reach the 40-route threshold.  The alternative, which is to incur the cost of hiring, training, and paying significantly more drivers than is necessary to satisfy a DSP's current routes in the hopes that ALI would approve such hires and offer additional routes, is not economically feasible or sensible.

39.     ALI only provided Plaintiff with one-week's notice of the routes for the week and would frequently make changes or reduce scheduled routes the same day when ALI experienced low inventory or labor shortages at its warehouse, leaving many of Plaintiff's scheduled drivers suddenly without work.  Under state and federal law, Plaintiff was still required to pay drivers for four hours if they were scheduled but did not drive.  ALI refused to reimburse Plaintiff for those wages.

40.     Conversely, if circumstances arise where a DSP cannot cover an assigned route – such as, for example, driver illness, maintenance issues, etc. – ALI fines them.

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

41.     DSPs have no control over ALI's routes.  ALI refuses to allow DSPs any ability to modify or optimize routes to account for terrain, density, traffic congestion, construction, or any other important considerations.

42.     ALI automatically accepts routes on behalf of DSPs, depriving DSPs the ability to deny the route without incurring route cancellation fines, suffering a reduction in its scorecards, and/or receiving threats of being in breach of contract.

43.     For example, ALI required Plaintiff to accept routes in downtown Sacramento, California where parking is extremely limited and expensive, and where Fli-Lo's drivers had to navigate under the unique challenges associated with delivering packages in a dense, congested, downtown urban core.

44.     Similarly, ALI frequently required Fli-Lo to accept routes in areas with many multifamily dwellings and high-rise offices.

45.     Despite the challenges arising from delivering thousands of packages each day in these areas, ALI refuses to adjust the number of packages per route to accommodate for the additional time it took to deliver packages to multifamily dwellings and high-rise offices as well as the additional time it would take to find safe and legal parking.

46.     Upon information and belief, DSP owners have requested that ALI allow them to use smaller vans and revise their routes in areas where streets are extremely narrow, sloped, and have tight switchbacks.  ALI has refused to permit DSPs to use alternative vehicles suitable for the delivery location.  ALI's vans do not fit these streets and drivers are unable to safely make turns.  Despite incurring expected and forewarned damages, ALI penalizes the drivers and DSPs for the damage and refuses to reimburse the DSPs or help pay for repairs.

47.     ALI does not accommodate for these numerous obstacles mentioned in the preceding paragraphs when allocating time for each route.  As a result, ALI consistently penalizes DSPs and their drivers for, among other things, not completing deliveries

CLASS ACTION COMPLAINT - 12

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

within ALI's mandated schedule or returning to the ALI warehouse with undelivered packages.

48.   Not only does ALI retain exclusive control over DSPs' routes, but it also retains complete control over package count distribution for each route and for each driver.  As a result, there is significant disparity in package distribution among routes and among drivers for no justifiable reason.  The difference in package counts among drivers does not correspond to the difficulty or challenges associated with a particular route or the experience of a particular driver.

49.   Consequently, to fully complete ALI's required routes in a single day, Plaintiff's drivers would work over their defined route assignments of eight-to-ten-hour shifts.  As required under state and federal law, Plaintiff had to pay the difference, including overtime wages.  ALI refused to reimburse Plaintiff for these additional wages and costs, even though ALI prohibited Plaintiff from modifying routes and package counts to reduce and/or eliminate these additional costs.

50.   ALI's refusal to assign reasonable routes with reasonable package counts caused significant damage to Plaintiff.  When Plaintiff's drivers were unable to fully complete routes ALI assigned on a given day, it was counted against Plaintiff and its drivers.  Plaintiff's scorecards were negatively affected, which negatively affected its eligibility for bonuses, limited potential business growth, and jeopardized future route assignments.

51.   To mitigate the harsh consequences to its drivers and to its business, Plaintiff had to pay additional drivers to go "rescue" overburdened drivers on the road in order to complete ALI's assigned routes.  ALI refused to reimburse Plaintiff for these additional rescue drivers.

52.   Due to rapid turnover of drivers and to avoid penalties and a reduction in its scorecards because ALI's unreasonable route assignments became so common, Fli-Lo had to schedule additional drivers to ensure all routes assigned by ALI were covered.

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

As a result, any standby drivers who were not given a route were paid for a four-hour minimum shift.  ALI refused to reimburse Plaintiff for these additional costs.

53.    Upon information and belief, ALI is aware that its route assignments and package counts cannot reasonably be completed in a standard work shift.  ALI tracks DSP drivers' every move and calls DSPs if ALI determines that one or more of their drivers are not completing deliveries quickly enough.  ALI would then demand that DSPs dispatch rescue drivers but, as asserted above, ALI refuses to reimburse DSPs for these rescue drivers.

54.    DSPs are required to bear the costs of the additional rescue drivers, without reimbursement from ALI, even though ALI schedules the routes and package counts and refuses to allow DSPs to modify the routes or package counts in ways that would ensure that every driver could timely complete all deliveries during a standard work shift.

55.    ALI's conduct also jeopardized the safety of DSP drivers as well as members of the public.  DSP drivers are unable to complete ALI's unreasonable routes and package counts in a 10-hour shift without sacrificing care and safety precautions, and ALI refuses to pay the drivers more if the routes take longer to complete.  ALI's unreasonable requirements result in numerous injuries to DSP drivers, including back injuries resulting from ALI's fast paced load-out requirements at the warehouse and falls and strains from rushed deliveries.  The rushed deliveries also put the community at risk.

56.    Fearing the consequences from ALI for not completing deliveries on time, including discipline or termination, DSP drivers frequently sustain injuries while trying to satisfy ALI's unreasonable productivity requirements.  Because ALI exclusively controls routes and package distributions, DSPs are unable to make the conditions any safer for its drivers.  When DSP drivers inevitably suffered injuries, DSPs are responsible for paying the workers' compensation claims without reimbursement from ALI.

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

**B.** **ALI Maintains Complete Control Over DSPs' Operations**

57. Amazon portrays the DSP Program as an opportunity for small business owners to build their businesses and work with ALI for each party's benefit. In reality, the DSP Program only benefits Defendants. The DSP Program was carefully designed to allow ALI to shift costs and liabilities onto DSPs, while maintaining complete control over the DSPs' operations, drivers, and ability to succeed.

58. Consistent with ALI's complete control over route assignments and package distribution, ALI maintains exclusive control over nearly every aspect of DSPs' operations, as described above. DSPs are required to strictly adhere to ALI's rules and policies, which ALI could unilaterally change at any time, without notice to DSPs and without DSPs' consent.

59. The marketing materials provided by ALI advertised each DSP owner is able to interview, vet, and hire its drivers. *See* Exhibit A attached hereto.

60. In reality, a DSP owner cannot hire a driver unless ALI approves them. ALI audits, monitors, and controls the content of DSPs' employment applications, any offers of employment, and DSPs' employee handbooks.

61. DSPs are allowed to hire an applicant only if ALI approves. ALI dictates the training and sets the minimum wage that DSPs are required to pay its drivers.

62. ALI's driver training is inadequate. DSP drivers who had never driven anything larger than a standard sedan are given two days to learn how to operate and maneuver large delivery vehicles in narrow urban areas. Furthermore, one of the two training days are spent learning Amazon-specific procedures for how to load and unload the trucks and how to use Amazon's required Flex and Mentor applications. As a result of the inadequate training, damage to DSP vehicles is common and is an expense borne exclusively by the DSP owners.

63. ALI controls the clothing and personal grooming requirements of DSP drivers. ALI requires that DSP drivers wear ALI-branded clothing, or in the alternative,

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104 Tel: 206-652-8660

other types of clothing approved by ALI. ALI also determines what constitutes "acceptable" grooming. ALI further mandates that drivers adhere to ALI's rules pertaining to body odor, perfume or cologne, clean teeth, face, ears, fingernails, and hair.

64. ALI requires that DSP drivers submit to ALI's geo-tracking and monitoring systems, including camera recording, so that ALI can always monitor DSP drivers while they make deliveries.

65. ALI requires DSP drivers use ALI's Flex application and Mentor application for smart phones. With these applications, ALI tracks, among other things, delivery status, driver location, seat belt use, vehicle acceleration, braking, cornering, fuel efficiency, driver distractions, and any damage to DSPs' delivery vehicles. ALI even requires DSP drivers to inspect for damages on their vehicles and report any damage directly to ALI.

66. ALI also retains the power to discipline and terminate DSP drivers for any reason and without notice. To complete a scheduled route, DSP drivers need access to ALI's Flex application. ALI will terminate or suspend DSP drivers access to the application, effectively terminating DSP drivers. ALI frequently threatens to penalize or terminate DSP drivers for keeping packages in the front seat of the van, failing to wear ALI's official uniform, leaving a van unlocked at a stop, leaving a van running in idle during a stop, temporarily placing packages on the ground to get organized, accelerating or braking too quickly, or even failing to consent to any of ALI's tracking and monitoring systems including camera recording.

67. On information and belief, ALI would selectively enforce its rules arbitrarily to pit DSPs against each other in an effort to increase productivity for ALI and drive down ALI's costs by, *inter alia*, decreasing to the point of eliminating at times the ability of a DSP to qualify for a weekly performance bonus.

68. ALI also has the power to unilaterally terminate DSP drivers for certain purported infractions. After ALI unilaterally terminated Plaintiff's drivers who were

CLASS ACTION COMPLAINT - 16

scheduled for a route, ALI would then fine Plaintiff for failing to have a driver to cover that route.  As a result, Plaintiff was forced to either pay the fine to ALI or, in order to fill the vacancy created by ALI's unilateral decision to terminate the driver, hire additional standby drivers to fill the void, without reimbursement from ALI.

69.  As expected, Plaintiff's terminated drivers filed for unemployment, and Plaintiff was required to pay the unemployment costs.  ALI refused to reimburse Plaintiff for these additional costs.

70.  ALI's unilateral decisions to terminate DSP drivers also adversely affected the DSPs' scorecards, bonus eligibility, and business growth.

71.  ALI's control over DSPs' business operations extended into payroll and insurance decisions.  ALI deprives DSPs from any meaningful choice in selecting payroll and insurance companies.  Any changes to DSPs' payroll are monitored by ALI.

72.  Initially ALI required Fli-Lo to obtain insurance through Aon.  After a driver totaled a Fli-Lo vehicle, Aon cancelled Fli-Lo's policy, and Fli-Lo was required to obtain insurance through another carrier.

73.  ALI's control over DSPs' payroll includes ALI having unrestricted access to DSPs' employee records and personnel information.  ALI has full access to DSPs' employee records and private employee information through Paycom and ALI's web-portal, which is required to onboard delivery drivers.  Not only does ALI have access to that private employee information, but ALI monitors changes to payroll without the DSPs' consent.

74.  ALI dictates the use of ALI-branded delivery vans and requires DSPs to contract with a specific delivery van company approved by ALI.  ALI also prohibits DSPs from placing their own logos on any of their leased vehicles.

75.  To do business as a DSP, ALI required that Plaintiff sign a vehicle lease with Element Fleet for its first 20 vehicles.  Plaintiff had no ability to negotiate the terms of the lease with Element Fleet, including price or van style.  Plaintiff was responsible for

CLASS ACTION COMPLAINT - 17

paying for the leases and all insurance costs.  For the first 20 vehicles, ALI strictly prohibited Plaintiff from using a different vehicle company, even though other companies provided better vehicles, lower prices, or more favorable terms.

**C.    Rate Cards**

76.    As part of the DSP Program, ALI agreed to reimburse DSPs for drivers' base wages.

77.    In order to be competitive in the Sacramento, California market, Plaintiff offered starting wages at $16.50 per hour for its drivers, which was higher than the national average in the area.  Plaintiff did this to remain competitive in the market and in an attempt to lower the turnover rate for DSP drivers.  Therefore, from the beginning, Plaintiff paid out-of-pocket to cover the deficit in the reimbursement rate.

78.    Plaintiff's efforts were futile.  In or around October 2020, ALI unilaterally increased the rate card reimbursement rate, which is now in line with what Plaintiff's drivers were making.

79.    As a result, and to stay competitive, Plaintiff increased its drivers' pay to $17.00 an hour if they drove for Fli-Lo more than six consecutive months.

**D.    Arbitrary Metrics & Bonuses**

80.    Under the DSP Program, ALI has complete discretion to award bonuses, impose and enforce rules and conditions, and control nearly every aspect of DSPs' operations.  This allows ALI to maintain complete control over its delivery network while simultaneously reducing costs and avoiding liability.

81.    DSPs rely on the bonuses to have any realistic chance of achieving profitability, given the high operating costs and additional expenses that result from ALI's conduct.

82.    ALI frequently claimed that bonuses were determined by ALI's "matrix." When Plaintiff asked what factors were considered in the matrix, and whether those

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

factors were measured by any objective standards, ALI repeatedly refused to provide any information.

83.     ALI has complete discretion to terminate a DSP employee and arbitrarily punish DSPs and their drivers for petty matters, which negatively affects a DSP's ability to achieve bonuses.  For example, ALI would impose a "driver defect" on Plaintiff's drivers.  As far as Plaintiff was able to discern, a defect occurred when Amazon or an Amazon customer complained about a delivery, regardless of the significance of the alleged complaint or its legitimacy.

84.     Additionally, DSP drivers are required to take photographs of their deliveries for ALI.  However, ALI does not make the photographs available to the DSPs.  Therefore, DSPs are frequently penalized for customer complaints or thefts it has no knowledge or control of and no way to dispute.

85.     DSP drivers receive defects for various, petty infractions, including, but not limited to, placing a package on one side of an Amazon customer's door instead of the other side, or leaving a package at an apartment's front office rather than directly at the customer's door because the customer failed to provide access into a secure building.

86.     ALI even issues driver defects for leaving packages outside a gated yard when a dog was present, despite ALI's own policy prohibiting drivers from opening any gates if a dog is present.

87.     Without inquiring into the matter or attempting to verify the truthfulness of Amazon's or a customer's complaint, ALI imposes defects against DSP drivers, which ALI then counts against the DSPs under its matrix.

88.     There is no mathematical formula the DSPs are given to determine the number of infractions a DSP could incur, each week, to still obtain a bonus.

89.     Despite its overall success in delivering packages on a weekly basis, Fli-Lo only received a bonus for roughly 5% of the weeks it operated as a delivery partner for

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

1  ALI.  Fli-Lo repeatedly requested information for how bonuses were calculated but was
2  not provided with the details.

3       90.    Without weekly bonuses, it is impossible for a DSP to achieve the profit
4  range promised in Amazon's promotional materials.

5       91.    Amazon representatives also complained directly to Plaintiff if Amazon was
6  unsatisfied with Plaintiff's services.   At times, Plaintiff worked directly with Amazon
7  representatives to resolve the issue.

8       92.    ALI frequently penalizes DSPs and their drivers.  For example, ALI will often
9  schedule DSP drivers to deliver packages to businesses on the weekend.  DSP drivers,
10  who are already overworked because of ALI's strenuous requirements, will attempt
11  delivery of packages, only to learn that many of the businesses are closed on weekends
12  and unable to receive packages.  When the drivers bring the undeliverable packages
13  back to the ALI warehouse, ALI penalizes the DSPs' and drivers' "delivery completion"
14  rates.  The DSPs' "completion metric" under the ALI matrix is also adversely affected.

15       93.    ALI also punishes DSPs when drivers deliver packages in rural areas
16  without cell coverage and ALI's tracking apps become temporarily inactive or go offline.

17       94.    If DSP drivers bring packages back to the ALI warehouses due to inclement
18  weather, accident, injury, illness, family emergency, or any other unanticipated event
19  through no fault of the driver or DSP, ALI marks the incomplete delivery against the DSP
20  and their drivers.

21       95.    ALI refused to provide Plaintiff with objective standards with respect to the
22  ALI matrix.  However, ALI would exercise its unchecked discretion to penalize Plaintiff
23  and its drivers for the slightest alleged infraction, and then claim that Plaintiff did not
24  qualify for bonuses under the undisclosed ALI matrix formula.

25       96.    Upon information and belief, the success of the DSP Program depends on
26  ALI's ability to maintain absolute power to create the rules, withhold disclosure of the
27  rules, and then change the rules as ALI pleases.  The success of the DSP Program

CLASS ACTION COMPLAINT - 20

1  depends on ALI's ability to maintain complete consolidation of power in every aspect of
2  the delivery operations.

3      97.    By establishing arbitrary standards, which ALI refuses to disclose, and then
4  imposing penalties for alleged violations of these undisclosed, arbitrary standards, ALI
5  is able to throttle DSPs' success at any time, simply by stating that DSPs' performance
6  fails to meet the standards of the ALI matrix.  ALI offers no further explanation; it merely
7  states that, based on the ALI matrix, DSPs are not eligible for a bonus.  There is no
8  objective standard applied and ALI only offers inconsistent or inaccurate information,
9  which makes it impossible for a DSP to improve performance, remain profitable, and
10 grow its business.  Like everything else in the DSP Program, ALI maintains exclusive
11 control over the ALI matrix formula and therefore retains the ability to arbitrarily deny
12 paying DSPs.

13     98.    Not only does this consolidation of power allow ALI to reduce its costs by
14 withholding earned bonuses, but ALI is also able to ensure that no particular DSP gains
15 too much power or influence over a particular service area.

16     99.    ALI's interference, imposition of arbitrary penalties, lack of good faith, and
17 unlawful and unconscionable conduct described herein caused Plaintiff to suffer
18 significant economic losses and a substantial diminution in the value of its business.

19     100.   On March 4, 2021, Plaintiff sent ALI a demand letter, asking ALI to remedy
20 its misconduct and pay Plaintiff for its losses.  ALI refused.

21     101.   On May 15, 2021, ALI terminated the DSP Agreement with Plaintiff.

22                          **CLASS ACTION ALLEGATIONS**

23     102.   Plaintiff brings this action pursuant to Rule 23 of the Federal Rules of Civil
24 Procedure on behalf of itself and all others similarly situated.  The "Class" is defined as:

25          All business entities in the United States that executed a 2.0
           DSP Agreement with ALI, acting on behalf of Amazon, from
26          2019 to present.

27

CLASS ACTION COMPLAINT - 21                    **BRESKIN | JOHNSON | TOWNSEND** PLLC
                                              1000 Second Avenue, Suite 3670
                                              Seattle, Washington 98104  Tel: 206-652-8660

103.  Specifically excluded from the Class are members of Defendants' boards of directors and Defendants' senior executives who entered into and/or enforced the DSP Agreement.  Also excluded from the Class are the United States Government, any judicial officer presiding over this action and the members of their immediate family and judicial staff, and any juror assigned to this action.

104.  The Class members are so numerous and geographically dispersed that joinder of all members is impracticable.  Based upon publicly available information, there are thousands of Class members.

105.  While the exact number and identity of Class members is unknown to Plaintiff, this can be ascertained from readily available information, including Defendants' records.

106.  Plaintiff's claims are typical of the claims of other Class members.  Plaintiff and the members of the Class sustained damages due to Defendants' violations of law alleged herein, which arise out of Defendants' common course of conduct in connection with a standard, common DSP Agreement, and standard, common marketing materials. The injuries and damages of each Class member were directly caused by Defendants' wrongful conduct in violation of the laws as alleged herein.

107.  Plaintiff will fairly and adequately protect the Class's interests and has no conflicts of interest with the Class.

108.  Plaintiff is represented by sophisticated, competent class action counsel, experienced in litigating complex antitrust and class actions.  Defendants have acted in an unlawful manner on grounds generally applicable to all Class members.

109.  The questions of law or fact common to the claims of the Class predominate over any questions affecting only individual Class members, including legal and factual issues relating to liability and damages, such that certifying this case as a class action is superior to other available methods for the fair and efficient adjudication of the

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

controversy.  Questions of law and fact common to all Class members, include, but are not limited to:

a.      Whether Defendants violated their duties of good faith and fair dealing by unilaterally controlling or changing key aspects of the DSP Agreements knowing that by doing so DSPs would be prevented from earning performance bonuses or otherwise achieving the full economic benefit of the DSP Agreements;

b.      Whether Defendants' marketing materials regarding the profit range were false and/or misleading given that Defendants knew that any DSP owner was highly unlikely to fall within that range;

c.      Whether DSPs are franchisees under RCW 19.100.010;

d.      Whether Defendants violated RCW 19.100.180(1) by failing to deal with Plaintiff and members of the Class in good faith during the term of the DSP Agreements;

e.      Whether Defendants violated RCW 19.100.180(2)(b) by requiring Plaintiff and members of the Class to purchase or lease goods and services from Defendants' approved services, including Element Fleet, Paycom, and Aon Insurance, without proving that such restrictive purchasing agreements were reasonably necessary for a lawful purpose justified on business grounds, and did not substantially affect competition;

f.      Whether Defendants violated RCW 19.100.180(2)(e) by obtaining money, goods, and services from Defendants' approved services like Element Fleet, Paycom, and/or Aon Insurance;

g.      Whether Defendants violated RCW 19.100.180(2)(g) by wrongfully requiring Plaintiff and members of the Class to release Defendants from all liability and indemnify Defendants for any losses or damages;

CLASS ACTION COMPLAINT - 23

**BRESKIN | JOHNSON | TOWNSEND** PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

h.    Whether Defendants violated RCW 19.100.180(2)(h) by imposing burdensome, unreasonable, and unnecessary obligations on Plaintiff and members of the Class;

i.    Whether Defendants violated RCW 19.100.180(2)(j) by prematurely and wrongfully terminating Plaintiff's and members of the Class's franchises;

j.    Whether Defendants' violation of the Washington Franchise Investment Protection Act constitutes an unfair or deceptive act or practice under the Washington Consumer Protection Act; and

k.    Whether Plaintiff and members of the Class have sustained damages.

110.  Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would create.  The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

111.  The prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

112.  Plaintiff is unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

CLASS ACTION COMPLAINT - 24

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

1

2

## FIRST CLAIM FOR RELIEF

## (Fraud)

3       113.   Plaintiff incorporates the Complaint's allegations by reference and realleges

4    them as though fully set forth herein.

5       114.   Defendants knowingly made material false representations and/or

6    knowingly concealed material facts in the uniform marketing materials they provided to

7    prospective DSPs (*see* Exhibit A attached hereto) and the DSP Agreements to mislead

8    Plaintiff and members of the Class regarding the true nature of the DSP Program,

9    including, but not limited to: (i) falsely claiming that a typical DSP could expect to earn

10   profits falling within a range that they knew was, in fact, rarely achievable; (ii) failing to

11   disclose the actual profit range that would be achievable for each DSP owner or the

12   actual market rate for drivers; and (iii) falsely representing to Plaintiff and members of

13   the Class that they would have significant control over their business operations.

14   Defendants intended Plaintiff and members of the Class to rely on the material

15   misrepresentations and concealment of truth so that Defendants could financially

16   benefit.

17      115.   Defendants knew that their material false representations and/or

18   concealment of material facts would reasonably induce reliance by Plaintiff and members

19   of the Class.

20      116.   Plaintiff and members of the Class were ignorant to the truth and reasonably

21   relied on Defendants' false representations and material omissions.

22      117.   Had Plaintiff and members of the Class known the truth about the DSP

23   Program, neither Plaintiff nor members of the Class would have proceeded with the DSP

24   Agreements on the terms offered.

25      118.   As a direct and proximate result, Plaintiff and members of the Class have

26   been injured and are entitled to compensatory economic damages.

27

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

**SECOND CLAIM FOR RELIEF**

**(Fraudulent Inducement)**

119.  Plaintiff incorporates the Complaint's allegations by reference and realleges them as though fully set forth herein.

120.  Defendants knowingly made material false representations and/or knowingly concealed material facts in the uniform marketing materials they provided to prospective DSPs (*see* Exhibit A attached hereto) and the DSP Agreements, including, but not limited to: (i)  falsely claiming that a typical DSP could expect to earn profits falling within a range that they knew was, in fact, rarely achievable; (ii) failing to disclose the actual profit range that would be achievable for each DSP owner or the actual market rate for drivers; and (iii) falsely representing to Plaintiff and members of the Class that they would have significant control over their business operations.  Defendants intended Plaintiff and members of the Class to rely on the material misrepresentations made in the marketing materials and DSP Agreements so that Defendants could financially benefit.

121.  Defendants knew that the material misrepresentations and/or concealment of material facts made in the marketing materials and DSP Agreements would reasonably induce reliance by Plaintiff and members of the Class.

122.  Plaintiff and members of the Class were ignorant to the truth and reasonably relied on the false representations and material omissions made in the marketing materials and DSP Agreements.

123. Had Plaintiff or members of the Class known the truth about the misrepresentations that were contained in the marketing materials and DSP Agreements, neither Plaintiff nor members of the Class would have signed the contracts on the terms offered.

124.  As a direct and proximate result, Plaintiff and members of the Class have been injured and are entitled to compensatory economic damages.

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

1

### THIRD CLAIM FOR RELIEF

2

### (Breach of Implied Covenant of Good Faith and Fair Dealing)

3      125.   Plaintiff incorporates the Complaint's allegations by reference and realleges

4  them as though fully set forth herein.

5      126.   Defendants portrayed the DSP Program to be one of mutual benefits to the

6  parties and Plaintiff and members of the Class entered into the program for a mutual

7  economic benefit of the parties.

8      127.   Defendants owed a duty of good faith and fair dealing to Plaintiff and

9  members of the Class by virtue of the DSP Agreements.  The DSP Agreements grant

10 Defendants wide exclusive discretion to manage all aspects of the DSP Program.  As a

11 result of the broad and exclusive control given to Defendants, Plaintiff and members of

12 the Class were at the mercy and exclusive control of Defendants.

13     128.   Plaintiff and members of the Class had the reasonable expectation that

14 Defendants would act in good faith and would not act arbitrarily with respect to bonus

15 eligibility under the ALI matrix, route allocations, package count distribution, enforcement

16 of rules or policies, rate cards and reimbursement, scheduling, and termination and/or

17 discipline of Plaintiff and members of the Class's drivers; that Defendants would not act

18 in ways that allowed Defendants to maintain nearly complete control over Plaintiff and

19 members of the Class's business operations; that Defendants would not unreasonably

20 shift costs and liabilities onto Plaintiff and members of the Class; and that Defendants

21 would refrain from acting in ways that made it unreasonably difficult or impossible for

22 Plaintiff and members of the Class to succeed and receive the benefits that Plaintiff and

23 members of the Class were entitled to under the DSP Agreement.

24     129.   Defendants breached the duty of good faith and fair dealing by:

25         a.  Acting arbitrarily with respect to bonus eligibility under the ALI matrix;

26         b.  Arbitrarily penalizing Plaintiff and members of the Class and selectively

27             enforcing its rules against them;

CLASS ACTION COMPLAINT - 27

**BRESKIN** | **JOHNSON** | **TOWNSEND** PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

c. Making unreasonable routing allocations and package count distributions for Plaintiff and members of the Class and prohibiting Plaintiff and members of the Class from making changes to Defendants' mandated assignments;

d. Unilaterally changing route allocations without sufficient notice to Plaintiff and members of the Class when it benefited Defendants;

e. Failing to reimburse Plaintiff and members of the Class for additional costs that they incurred as a result of Defendants' unilateral decisions;

f. Failing to disclose the market rate for the rate card reimbursement and failing to reimburse Plaintiff and members of the Class at those market rates;

g. Interfering with Plaintiff and members of the Class's business relationships with third-party vendors and with Plaintiff and members of the Class's employees;

h. Acting in ways that increased costs for Plaintiff and members of the Class but prohibiting Plaintiff and members of the Class from making changes to mitigate or reduce those costs and failing to reimburse Plaintiff and members of the Class for those additional costs; and

i. Exposing Plaintiff and members of the Class to significant legal liabilities.

130. As a result of Defendants' breaches, Plaintiff and members of the Class suffered actual damages.

**FOURTH CLAIM FOR RELIEF**

**(Violation of Washington's Consumer Protection Act**

**(RCW 19.86, *Et. Seq.*)**

**Based On Violations of Washington's Franchise Investment Protection Act**

**(RCW 19.100, *Et Seq.*))**

131. Plaintiff incorporates the Complaint's allegations by reference and realleges them as though fully set forth herein.

CLASS ACTION COMPLAINT - 28

132. Defendants' DSP Program is a franchise pursuant to RCW 19.100.010(6)(a).  Specifically, under the DSP Agreements, Plaintiff and members of the Class were granted the right to engage in the business of offering, selling, or distributing goods or services under a marketing plan prescribed or suggested in substantial part by Defendants; the operation of Plaintiff's and members of the Class's businesses were substantially associated with a trade mark, service mark, trade name, advertising, or other commercial symbol designated, owed, or licensed by Defendants; and Plaintiff and members of the Class agreed to pay, or were required to pay, directly or indirectly, a franchise fee for the right to enter into a business or to continue to do business in that Defendants: (1) required Plaintiff and members of the Class to pay Defendants' vendors for goods or services, which were not priced at the fair market rental value; and (2) imposed arbitrary penalties and fines against Plaintiff and members of the Class in order to continue to do business under Defendants' trademarks and/or tradenames.   On information and belief, Defendants received a benefit from these vendors in exchange for requiring Plaintiff and members of the Class to pay for and use their goods and services.

133. Accordingly: (i) Defendants sold Plaintiff and members of the Class a franchise under RCW 19.100.010(6) when the parties entered into the DSP Agreements; (ii) Defendants are franchisors under RCW 19.100.010(10); and (iii) Plaintiff and members of the Class are franchisees under RCW 19.100.010(9).

134.  Parties to a franchise agreement have a statutory duty to deal in good faith pursuant to RCW 19.100.180(1).  Defendants did not deal with Plaintiff or members of the Class in good faith during the term of the DSP Agreements.

135. Pursuant to RCW 19.100.180(2)(b), a franchisor may not require a franchisee to purchase or lease goods or services from the franchisor, or from approved sources of supply, unless and to the extent that the franchisor satisfies the burden of proving that such restrictive purchasing agreements are reasonably necessary for a

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

lawful purpose justified on business grounds, and do not substantially affect competition. Defendants wrongfully required Plaintiff and members of the Class to purchase or lease goods or services from approved services, including Element Fleet, Paycom, and Aon, without proving that such restrictive purchasing agreements were reasonably necessary for a lawful purpose justified on business grounds, and did not substantially affect competition.

136.  Pursuant to RCW 19.100.180(2)(e), a franchisor may not obtain money, goods, services, anything of value, or any other benefit from any other person with whom the franchise does business on account of such business unless such benefit is disclosed to the franchisee.  On information and belief, Defendants obtained money, goods, services, anything of value, or other benefit from Element Fleet, Aon Insurance, and/or Paycom, and failed to disclose the benefits to Plaintiff and members of the Class.

137.  Pursuant to RCW 19.100.180(2)(g), a franchisor may not require a franchisee to assent to a release, assignment, novation, or waiver which would relieve any person from liability imposed by this chapter.  Pursuant to the DSP Agreements, Defendants wrongfully required Plaintiff and members of the Class to release Defendants from all liability and indemnify Defendants for any losses or damages.

138.  Pursuant to RCW 19.100.180(2)(h), a franchisor may not impose on a franchisee obligations that are not reasonably necessary.  Defendants imposed burdensome, unreasonable, and unnecessary obligations on Plaintiff and members of the Class in violation of RCW 19.100.180(2)(h).

139.  Pursuant to RCW 19.100.180(2)(j), a franchisor may not terminate a franchise prior to the expiration of its term except for good cause.  Defendants prematurely and wrongfully terminated Plaintiff and members of the Class's franchise in violation of RCW 19.100.180(2)(j).

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

140.  By virtue of its extensive franchise network and impact on commerce and on the public, Defendants' violations of RCW 19.100.180(1)-(2) have the potential to be repeated.

141.  Pursuant to RCW 19.100.190(1), violations of RCW 19.100.180 constitute unfair or deceptive acts or practices under Washington's Consumer Protection Act, RCW 19.86, *et seq.*

142.  RCW 19.86.020 provides that unfair or deceptive acts or practices are unlawful.

143.  RCW 19.86.090 establishes a private right of action for any person injured in his business or property due to violation of, *inter alia*, RCW 19.86.020, and permits that person to recover actual damages, enhanced damages not to exceed three times actual damages, and the costs of the suit including reasonable attorneys' fees.

144.  Defendants' violations of RCW 19.86.020, based on their violations of RCW 19.100.180, 190(1), proximately caused damage to Plaintiff and members of the Class.

145.  Plaintiff and members of the Class are entitled to actual damages, trebled, as well as the costs of bringing this action including reasonable attorneys' fees pursuant to RCW 19.86.090.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief as follows:

(A)  This action may be maintained as a class action, with Plaintiff as the designated Class representative and its counsel as Class counsel;

(B)  Plaintiff and the members of the Class recover threefold the damages determined to have been sustained by them as a result of the conduct of Defendants complained of herein, including, but not limited to, startup costs, and that judgment be entered against Defendants for the amount so determined;

(C)  For pre-judgment and post-judgment interest;

CLASS ACTION COMPLAINT - 31

(D)   For an award to Plaintiff and the Class of costs of suit, including reasonable attorneys' and experts' fees and expenses; and

(E)   For such other and further relief as the Court may deem just and proper.

### DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a jury trial as to all issues.

DATED:  April 5, 2022.

BRESKIN JOHNSON TOWNSEND, PLLC

By: *s/ Roger Townsend*
    Roger M. Townsend, WSBA #25525
    1000 Second Avenue, Suite 3670
    Seattle, WA 98104
    Tel: (206) 652-8660
    rtownsend@bjtlegal.com

KIRBY McINERNEY LLP

By: *s/ Daniel Hume*
    Daniel Hume (*pro hac vice* forthcoming)
    David Bishop (*pro hac vice* forthcoming)
    Andrew McNeela (*pro hac vice* forthcoming)
    Sarah Flohr (*pro hac vice* forthcoming)
    250 Park Avenue, Suite 820
    New York, NY 10177
    Tel.: (212) 371-6600
    Email: dhume@kmllp.com
    dbishop@kmllp.com
    amcneela@kmllp.com
    sflohr@kmllp.com

*Counsel for Plaintiff Fli-Lo Falcon, LLC and the Proposed Class*

EXHIBIT A



# Own your success

Start your own business and become
an Amazon Delivery Service Partner,
delivering smiles across your community.



Visit **logistics.amazon.com** to get started.





# The opportunity to lead

Amazon is seeking hundreds of entrepreneurs across the country to launch and operate their own package delivery business. The Delivery Service Partner (DSP) program provides an opportunity for strong leaders who are passionate about developing a hardworking team to start their own business. Joining a robust community of small businesses, you will help deliver thousands of packages to customers every day.

## Become an owner

If you're a customer-obsessed people person and enjoy coaching teams in a high-speed environment, this is the ideal opportunity for you. As an owner, you'll be fully responsible for hiring and developing a team of high-performing drivers. Access to Amazon's exclusive discounts on a suite of assets and services keeps owner startup costs as low as $10,000. As part of the DSP community, you'll operate your own delivery business with 20 to 40 vans and 40 to 100 employees, working alongside other owners in your area. We'll help you set up and get ready to operate out of a local Amazon delivery station, and you'll provide consistent coaching and support for your team, ensuring packages are delivered to customers seven days/week, 365 days/year.

## Successful owners can expect:

STARTUP COSTS AS LOW AS
**$10K**

ANNUAL REVENUE POTENTIAL
**$1M–4.5M**

ANNUAL PROFIT POTENTIAL
**$75K–300K**

*Figures are projections for owners operating with 20 to 40 vans.

Visit **logistics.amazon.com** to get started.



# What to expect

Launching a business becomes that much easier with Amazon's delivery volume and resources behind you.

## What you do

**Set up your business**
You can leverage a suite of exclusive Amazon-negotiated deals to start your business, and work with our network of top-in-class service providers to keep your operation rolling.

**Build your team**
You're a coach. This is your team. Your most important responsibility is recruiting and retaining solid drivers who will enable your ongoing success.

**Deliver packages**
Your team of drivers will deliver 20 to 40 routes per day, serving thousands of customers.

**Create your team culture**
You lead with a can-do attitude that ensures your business reflects Amazon's high standards and customer-obsessed culture. Coach, develop, and motivate your team to exceed expectations on every delivery.

**Grow your business**
Deliver a great customer experience and get the opportunity to hire more people, deliver more packages, and grow your business.

## What we do

**Get you started**
Exclusive deals on Amazon-branded vans, comprehensive insurance, industrial-grade handheld devices, and other services help you get your delivery business up and running.

**Provide training**
We provide three weeks of hands-on training to ensure you're set up for success. You'll start with a one-week introduction to Amazon in Seattle, followed by two weeks in the field working alongside existing owners and drivers to learn tips and tricks for operating a successful delivery business from those who know it best.

**Supply a comprehensive toolkit**
We give you the tools and technology you'll need to run your business, designed to keep your operation running smoothly.

**Offer on-demand support**
Owners receive ongoing support from Amazon, including a comprehensive operations manual, driver assistance for on-road issues, and a dedicated account manager.

**Share our experience**
Amazon brings more than 20 years of technology and logistics experience to guide you in one of the fastest-growing industries in the world.

Visit **logistics.amazon.com** to get started.



# What it takes to start your business

If you are selected, here are some of the steps you'll need to take to get your business up and running:

- **Create** your business entity and officially become a delivery business owner.

- **Order** your delivery vehicles, devices, fuel cards, and uniforms through recommended vendors at Amazon-negotiated rates. Obtain motor carrier operating authority for your company and apply for vehicle insurance.

- **Set up the services** you'll need for hiring and managing a team of drivers, such as background check, drug testing, payroll, and accounting services. Build your employee handbook, including determining how you will pay drivers and offer health benefits, and consult with legal and other advisors to finalize your plan.

- **Set up your account** in the DSP Portal. This will include providing your company's bank account details for payments, completing a tax interview, and uploading business documents.

- **Start interviewing**, vetting, and hiring your first drivers. This will be an ongoing process as you keep building your team and growing your business.

- **Set up your team's area** within your local delivery station, and learn and refine the processes and timing for loading your vehicles.

- **Train your team of drivers** on a customer-obsessed culture, along with the tools and processes they'll use to make deliveries. Start receiving your vehicles, devices, fuel cards, and uniforms in order to prepare for your first real routes.

- **Launch!** Start delivering five routes/day in your first week.

- **Have weekly check-ins** on performance with Amazon representatives from your local delivery station and your account manager. Successful owners add five additional routes in their 5th, 9th, and 11th week, bringing their business to 20 or more routes after three months.

Visit **logistics.amazon.com** to get started.



# A day in the life of an owner

Being an owner means leading your team in a high-speed and ever-changing environment.

 Schedule your drivers based on their availability and the needs of your business.

 Set up your team's routes and manage daily kickoff tasks, including checking in drivers and handing out devices, checking on your equipment and vehicles, and overseeing vehicle loadout.

 Lead a daily morning huddle with drivers before they head out to inform, inspire, and keep your team insync, and get everyone out the door promptly to start your day on the right foot.

 Track your drivers' progress as they make deliveries and manage any issues that arise, including general questions, flat tires, or drivers running behind.

 Leverage Amazon's support as needed. Consult your dedicated account manager, the on-road assistance team, and Amazon delivery station personnel for questions or issues with packages or routes.

 Manage your team's performance by reviewing business metrics, coaching, helping, and motivating your drivers to maintain a customer-obsessed culture and deliver results every day. You'll always keep recruiting and hiring as you continue to grow your business.

 Welcome drivers back to the station at the end of the day, conducting a route debrief and troubleshooting any undelivered packages.

 Check that all vans are refueled and parked away at the end of the night, and arrange vehicle maintenance as needed.

 Receive and provide feedback to your local delivery station team on how things are going.

Visit **logistics.amazon.com** to get started.



# Owner training program

Three weeks of comprehensive training to help kick-start your success.

**WEEK 1**

## Seattle—your introduction to Amazon and starting your business

- **Discover** Amazon's customer-obsessed culture
- **Receive** valuable advice on setting up a new business from an expert
- **Deep dive** all the exclusive deals that Amazon has negotiated for you
- **Master** the best practices of hiring, training, and engaging a large team of drivers
- **Learn more** about the ins and outs of running a delivery business

**WEEK 2**

## In the field—learning firsthand how Amazon operations work

- **Observe** the daily processes at an Amazon delivery station
- **Assist** in sorting and loading out Amazon packages
- **Work** alongside existing DSP owners to watch their dispatch and on-road management in action
- **Learn** about the tools used to manage a delivery business
- **Get acquainted** with delivery station personnel

**WEEK 3**

## In the field—understanding what it takes to be an Amazon Delivery Service Partner

- **Become familiar** with the tools used by drivers to deliver packages to customers
- **Take vans** on the road to deliver packages
- **Learn how** to troubleshoot common issues that your drivers may face on the road
- **Debrief** with station personnel after each day of deliveries, and gather tips and tricks on ways to improve delivery quality and efficiency



# Costs and revenue you can expect as an owner

Here are some of the key startup costs, ongoing operations costs, and revenue structure, so you know what you'll need upfront, and what to expect going forward. Cost and revenue will vary based on the size of your business and where you operate.

## Startup Costs

Your key startup costs for becoming an owner include the assets and services you'll need to officially create your business, start hiring your team, and get ready to deliver packages.

- Business entity formation and licensing
- Professional services—accounting costs and lawyer fees
- Setup supplies—laptop, timekeeping software
- Recruiting costs—job postings, drug and background checks, driver training
- Travel to training

## Ongoing Operation Costs

These are some of the key recurring costs you can expect as you run your business, continuing to hire and grow your team while ramping up your package deliveries.

- Driver costs—wages, payroll taxes, benefits, insurance, ongoing training
- Vehicle costs—van leases, routine maintenance, damages, insurance
- Other asset costs—devices, device accessories, uniforms
- Administrative costs—job postings, drug and background checks
- Professional services, as needed

## Revenue

Here's a look at our payment structure that'll drive your revenue from delivering Amazon packages.

- A fixed monthly payment based on the number of vehicles you are operating with Amazon
- A route rate based on the length of your route
- A per package rate based on the number of successfully delivered packages





# Access to exclusive deals

Leveraging Amazon's deals makes the entire setup process easy. We've negotiated exclusive deals on startup assets and ongoing business management services with top-in-class third-party providers to help you get your business started for as little as $10,000.

- Amazon-branded **vehicles** customized for delivery
- Vehicle **maintenance**
- **Vehicle insurance**
- **Fuel** program
- Professional **uniforms**

- Industrial-grade handheld **devices**
- **Recruitment** tool discounts
- **Payroll**, **tax**, and **accounting** services
- **Health benefits** and **employee services**
- **Legal** support



## For veterans

We're constantly looking for hands-on leaders with drive, dedication, and the ability to always deliver results for our customers. These traits look very familiar to those who have served our country in the armed forces. Amazon is committing $1 million toward funding DSP startup costs for military veterans, offering $10,000 reimbursements for qualified candidates.



# Testimonials

Learn how other DSPs have found success with their own delivery business.



Olaoluwa
Aurora, Colorado
Team size: 40

"I had prior experience running my own business but not in logistics. I was driving for Amazon Flex when I learned about the opportunity to start my own delivery company. Backed by Amazon's resources and logistics experience to learn while I earn and grow my business made this opportunity a no-brainer. In just five months, I have hired more than 40 employees, and it's encouraging to know that any driven individual can leverage the support from Amazon and the Delivery Service Partner community to build a successful, thriving business."



Lalo and Bobby
Austin, Texas
Team size: 75

"This has been a total partnership between Cargo Leasing Solution and Amazon. We got to focus on growing our team and the quality of work. Amazon took care of the rest. I really think we're building the foundation for a multi-generational business, thanks to this opportunity."



Riccardo and Judy
Aurora, Colorado
Team size: 50

"We've been married for 30 years, and we've always wanted to work together. This opportunity with Amazon gave us the chance to do that. Together, we are building a business within the best brand in the world. If it wasn't for Amazon's support and trust in our ability as leaders, we never would have built this company to what it is today."

Your success story starts here.

Visit **logistics.amazon.com** to get started.





# Become a DSP

Take the first step toward ownership.
Apply now at logistics.amazon.com.

From starting your application to making your first delivery, becoming an owner can take as little as one month or as long as six months, depending on the availability of opportunities in your area.

- Submit your basic information and learn more
- Fill out a formal application
- Determine if it's the right fit
- Complete three weeks of hands-on training
- Set up your business and build a team
- Start delivering

## Questions?

Contact dsp@amazon.com with questions or to request to speak to an Amazon team member for more information on becoming an Amazon Delivery Service Partner.

**Visit logistics.amazon.com to begin the application process.**



*This is a new program, and while we have experience working with similar delivery companies and have conducted additional research in the delivery space, the startup cost, revenue, and profit figures included in this brochure are projections only and are not based on actual results of delivery companies. We do not guarantee results of any kind, including that what a delivery company earns will exceed the owner's investment in his or her business. Each delivery company's results will differ, and results will depend on a number of factors, including the owner's efforts and management of expenses as well as the size of the company.

The startup cost figure includes the cost of items that we believe are essential to starting a delivery company that delivers Amazon packages, beginning with five delivery vans. Importantly, the startup cost figure assumes that a delivery company takes advantage of all third-party deals impacting startup costs that have been negotiated by Amazon in connection with this program, including with respect to delivery van leasing, insurance, mobile devices and data plans, and uniforms. While a delivery company is not required to pursue any of those third-party deals in order to participate in this program, the delivery company may not be able to achieve the startup cost figure without doing so.

The revenue range is based on rates offered in cities in which we operate, and actual revenues will differ based on a number of factors, including regional differences in the rates offered in connection with this program, the number of delivery vans that a delivery company operates, the number of delivery routes that a delivery company completes, the number of packages that a delivery company delivers, whether a delivery company participates in the vehicle leasing and uniform programs negotiated by Amazon, and whether there is variability in any of these factors over the course of a year. The revenue range is based on companies of various fleet sizes (between 20 and 40 vans), and the figures are annualized over a full year. As a result, a delivery company may not achieve the revenue figures in the range until it operates a fleet size of 20 to 40 vans for a full year, if ever.

The profit range is based on the same assumptions and subject to the same limitations as the revenue range. The profit range also incorporates our projections of the costs that a delivery company may incur to operate its business and further assumes that the fixed and variable components of the rate structure in connection with this program will compensate a delivery company for all of its fixed and variable costs on a dollar-for-dollar basis. A delivery company may not achieve the profit figure if its expenses exceed these amounts.

Visit **logistics.amazon.com** to begin the application process.

